J-A07033-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| MATTHEW EBO, | : | |
| | : | |
| Appellant | : | No. 92 WDA 2016 |

Appeal from the Judgment of Sentence November 28, 2012
in the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0002821-2012

BEFORE:  OLSON, STABILE, and STRASSBURGER*, JJ.

MEMORANDUM BY STRASSBURGER, J.:              **FILED JUNE 21, 2017**

Matthew Ebo (Appellant) appeals from the judgment of sentence imposed following his conviction for first-degree homicide and related offenses.  We affirm Appellant's convictions, but vacate his judgment of sentence and remand for resentencing.

Because we write only for the parties, a full recitation of the facts is unnecessary.  Relevant to this appeal, Appellant and co-defendant Thaddaeus Crumbley (Crumbley) (collectively, the co-defendants), were tried jointly in the Court of Common Pleas of Allegheny County on charges related to the May 16, 2011 shooting death of Todd Mattox.  A jury found both men guilty of first-degree homicide; robbery - serious bodily injury; robbery of a motor vehicle; two violations of the Uniform Firearms Act: carrying a firearm without a license and possession of firearms by a

_____
* Retired Senior Judge assigned to the Superior Court.

prohibited person; conspiracy to commit criminal homicide; and conspiracy to commit robbery - serious bodily injury. On November 28, 2012, during the joint sentencing hearing, Appellant was sentenced to a term of life imprisonment for his homicide conviction, and an aggregate term of 46 to 92 years of consecutive imprisonment on the remaining counts. Relevant herein, as part of the aggregate sentence, the trial court imposed consecutive ten-to-20-year sentences at count three (robbery of a motor vehicle) and count six (conspiracy to commit robbery - serious bodily injury).

On November 30, 2012, Appellant's trial counsel moved to withdraw from representation. The trial court granted this request by order dated December 12, 2012. After being appointed by the court, appellate counsel from the Allegheny County Public Defender's Office filed an emergency petition for leave to file post-sentence motions *nunc pro tunc*, which was granted. Appellant's post-sentence motion was subsequently denied by operation of law on June 26, 2013.

On July 25, 2013, counsel timely filed a notice of appeal to this Court, which was docketed at 1194 WDA 2013. However, before the appeal was heard, counsel filed an application for remand based upon a claim of after-discovered evidence. This Court granted counsel's request and ordered the

trial court to conduct a hearing to determine whether Appellant's claim merited a new trial.[1]

On October 29, 2015, the trial court held a joint hearing on the co-defendants' claims of after-discovered evidence. On December 22, 2015, the trial court denied the requested relief. Appellant filed timely a notice of appeal, and both Appellant and the trial court have complied with the mandates of Pa.R.A.P. 1925.

Appellant raises four issues for our review.

I.      Did the trial court abuse its discretion in failing to award [Appellant] a new trial based upon the recantation of the sole witness connecti[ng] him to the crime?

II.     Was the evidence that [Crumbley] was involved in gun violence and possessed a firearm two weeks after the homicide inadmissible evidence of other bad acts and was it completely irrelevant to whether [Appellant] was involved in the homicide when the subsequent incident had no connection to [Appellant]?

III.    Should identification evidence have been suppressed when the highly suggestive pre[-]trial identification procedure tainted the main eyewitness'[s] in-court identification of [Appellant]?

_____

[1] Crumbley's case followed a similar post-trial trajectory. Crumbley, through counsel, timely filed a notice of appeal after the November 28, 2012 sentencing. His appeal was docketed at 1997 WDA 2012. On January 5, 2015, while Crumbley's case was pending on appeal before this Court, his counsel filed a petition for remand on the basis of after-discovered evidence. This Court initially denied Crumbley's request, as well as his request for reconsideration of the same, and oral argument was scheduled for August 11, 2015. However, on August 11, 2015, before argument occurred, this Court remanded Crumbley's case for an evidentiary hearing on the after-discovered evidence claim.

IV.   Was the trial court's imposition of sentence under the unconstitutional statute, 18 Pa.C.S. § 9712, illegal when the factfinder never found the facts necessary beyond a reasonable doubt for the imposition of the mandatory minimum sentence?

Appellant's Brief at 12 (unnecessary capitalization and trial court answers omitted).

Appellant first claims that the trial court erred in denying his motion for a new trial based on after-discovered evidence. Appellant's Brief at 27-39.  We address this claim mindful of the following.

> To warrant relief, after-discovered evidence must meet a four-prong test: (1) the evidence could not have been obtained before the conclusion of the trial by reasonable diligence; (2) the evidence is not merely corroborative or cumulative; (3) the evidence will not be used solely for purposes of impeachment; and (4) the evidence is of such a nature and character that a different outcome is likely. At an evidentiary hearing, an appellant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted.

**Commonwealth v. Rivera**, 939 A.2d 355, 359 (Pa. Super. 2007) (citation omitted).

The after-discovered evidence at issue is the unsworn statement of eyewitness Saday Robinson in which she recanted her pre-trial and in-court identification of the co-defendants. The certified record shows the following. The May 16, 2011 shooting that resulted in Mattox's death occurred outside of Robinson's apartment. Robinson was presented with a number of photo arrays following the shooting, but did not identify Appellant as one of the shooters until July of 2012.  At trial, Robinson made a positive in-court

- 4 -

identification of both co-defendants, and noted that it was fear of retaliation that prevented her from identifying the men in the initial photo arrays. Robinson was cross-examined extensively as to the credibility of her identification.

In 2014, after both co-defendants had been sentenced, Robinson was interviewed by a defense investigator. This interview was recorded in writing and on video; however, Robinson was not sworn, nor did she give the statement under penalty of perjury. Robinson told the investigator that she did not witness the shooting, that her trial testimony was fabricated, and that her identification of the co-defendants was coerced by the police.

Robinson was called to testify at the October 29, 2015 evidentiary hearing. At that time, she recanted her statements to the investigator and claimed that her 2014 recorded statement was untruthful. When asked why she lied, she explained that she had been threatened by persons close to Appellant and Crumbley and had been offered a large sum of money to recant her trial testimony. However, Robinson affirmed at the evidentiary hearing that she was telling the truth when she identified Appellant and Crumbley as the shooters during their trial.

Appellant argues that he met his burden under **Rivera** and is entitled to a new trial based on Robinson's statement to the defense investigator because (1) the evidence of her recantation could not have been obtained before the conclusion of trial, (2) the evidence is not corroborative or

cumulative, (3) the evidence would not be used solely for the purposes of impeachment, and (4) the recantation is of such "immense importance" that a new outcome would have resulted had the jury been permitted to hear it. Appellant's Brief at 27-32.

As our Supreme Court has explained,

> [r]ecantation testimony is extremely unreliable. When the recantation involves an admission of perjury, it is the least reliable form of proof. The trial court has the responsibility of judging the credibility of the recantation. Unless the trial court is satisfied that the recantation is true, it should deny a new trial. An appellate court may not disturb the trial court's determination absent a clear abuse of discretion.

*Commonwealth v. Henry*, 706 A.2d 313, 321 (Pa. 1997) (citations omitted).

Here, the trial court determined that a new trial was not warranted because, at the evidentiary hearing on the co-defendants' claims of after-discovered evidence, Robinson "credibly recanted her unsworn recantation statements" made to the investigator. Trial Court Opinion, 12/22/2015, at 5. In so holding, the court found credible Robinson's explanation for why she made false statements to the investigator only to later recant those statements at the hearing. *Id.* The court explained as follows.

> As noted by the parties, [] Robinson provided testimony at the October 29, 2015 evidentiary hearing, during which she recanted the statements that she had made to [the] defense investigator … in videotaped and handwritten form. The videotaped and handwritten statements served as the recantation evidence upon which the defendants have relied in seeking a new trial based on after-discovered [] evidence. It should be noted that [] Robinson never took an oath to tell the

- 6 -

truth prior to giving the videotaped statement and did not write the handwritten statement under penalty of perjury. During her testimony at the October 29, 2015 hearing, Ms. Robinson explained that the statements that she had made in video and written form were untruthful. She explained that she had lied to [the] defense investigator … because she had been threatened by people associated with the defendants. Additionally, she had been offered a substantial sum of money -- $25,000 -- to recant her trial testimony.

The court paid extremely close attention to [] Robinson's demeanor throughout the evidentiary hearing, and it finds highly credible her explanation for why she initially attempted to recant her trial testimony to [the] defense investigator…. [] Robinson acknowledged that she is in fear for her life from the defendants. Her fear is due, in part, to her knowledge of the reputation of the defendants, their friends, associates and families, as well as the events she herself witnessed. She indicated, convincingly, that she would rather have lied than lost her life. [] Robinson was in fear from the defendants, given that people associated with them kept finding her despite several moves. Further, she testified credibly that she believed that, if she cooperated with the defense efforts, she would be left alone by the defendants. The court also found highly credible her explanation for why she recanted her post-trial recantation statements during the evidentiary hearing. [] Robinson indicated that she did not want guilty people to be let out of jail and that the defendants deserved to be in jail for what they had done. [] Robinson did not waver in her testimony at the evidentiary hearing and was adamant that her post-trial recantation statements were made out of fear and not as a result of any crisis of conscience that she was experiencing as to the certainty of her observations. At the October 29, 2015 hearing, [] Robinson very clearly, convincingly, and without hesitation, identified the defendants as the perpetrators of the murder. It must be noted that this was the second time that she made her identification of the defendants as murderers in a courtroom, in the presence of the defendants and under oath.

This court had the benefit of sitting through the original homicide trial, and it observed firsthand [] Robinson's demeanor when she provided her eyewitness account of the brutal murder and identified the defendants as the perpetrators. [] Robinson shook uncontrollably throughout her testimony and was clearly

frightened to be involved in the case. As the Commonwealth noted in its brief, [] Robinson had *nothing to gain and everything to lose* by testifying against the defendants during the homicide trial. This holds equally true with regard to her testimony at the evidentiary hearing related to her supposed recantation. [] Robinson has nothing to gain and everything to lose by recanting the unsworn recantation statements[.] She continues to place herself in danger of retribution by maintaining her position that the defendants were the perpetrators of the murder, which makes her identification testimony all the more credible. The fact that she maintains her identification of the defendants as murderers when under oath and forced to confront them face-to-face, and in light of her fear of the defendants based on their reputations, threats made to her, and her inability to remain hidden, makes [] Robinson's identification ring with truthfulness and credibility.

Accordingly, after taking into account the strength of [] Robinson's identification testimony at trial and after finding [] Robinson's testimony at the evidentiary hearing credible in all respects, this court finds that a new trial is not warranted under these circumstances. Given that [] Robinson has consistently identified the defendants while under oath, and given that her identification testimony has been very credible each time, the court does not find that the purported recantation evidence would "likely result in a different verdict if a new trial were granted." ***Commonwealth v. Padillas***, 997 A.2d 356, 363 (Pa. Super. 2010).

Trial Court Opinion, 12/22/2015, at 2-4 (unnecessary capitalization omitted; emphasis in original).

Based on our thorough review of the record, we conclude that the trial court did not abuse its discretion in determining that the unsworn statement offered to the defense investigator was not credible, and that Robinson had fabricated the statements out of fear of the co-defendants and their associates. Importantly, we agree that Appellant's argument fails as to the fourth prong of the applicable test. When presented with the purported

recantation testimony, the circumstances surrounding Robinson's statement to the defense investigator, and Robinson's later recantation of those statements under oath, it is unlikely that the verdict would be rendered in Appellant's favor. As such, the trial court did not err in denying Appellant a new trial based upon this evidence.

We now turn to Appellant's second issue on appeal: whether the trial court erred in denying a motion *in limine*, filed by Crumbley and joined by Appellant, which sought to exclude from the co-defendants' joint trial evidence regarding other bad acts attributable to Crumbley. Appellant's Brief at 40-52.

We provide the following background. The police recovered seven .40 caliber shell casings and two 357 Sig[2] shell casings from the scene of the May 16, 2011 shooting that resulted in the death of Mattox. Forensic testing showed that two of the recovered .40 caliber shell casings had been fired from one gun, while the other five had been fired from another. The presence of the two 357 Sig shell casings recovered from the scene evidenced the involvement of a third gun.

On June 2, 2011, a few weeks after the Mattox shooting, Crumbley was injured in a shootout in Swissvale, Allegheny County. When police arrived at that scene, they found a number of spent shell casings in and

---

[2] As explained during trial, "the 357 Sig caliber is a 40 caliber cartridge case which is bottlenecked down to fit a nine millimeter [bullet]." N.T., 8/20-9/4/2012, at 457.

around the vehicle in which Crumbley had been riding. Those shell casings were tested and determined to have come from two separate firearms: a 9mm and a .40 caliber. The 9mm casings were all determined to have been discharged from a Ruger P89 firearm recovered from the vehicle in which Crumbley had been riding prior to and during the June 2, 2011 shootout. Crumbley's blood was found on the side of the Ruger and on the barrel.

Also present at the scene of the shootout was Asa Thompkins, who was released after a brief detention. On June 9, 2011, Thompkins was a passenger in a vehicle that was stopped by police. Police recovered a .40 caliber Springfield Armory pistol during a search of that vehicle.

Three bullets were recovered from Mattox's body during his autopsy, two 9mm rounds and one .40 caliber. At trial, the Commonwealth's firearms and tool marks expert, Raymond Everett, testified that his examination of the recovered bullets led him to conclude that the two 9mm bullets were fired from the same gun: either a 357 or a 9mm firearm; however, no definitive comparison could be made to any 357 or 9mm firearm tested in connection with this case. N.T., 8/20-9/4/2012, at 460-61, 471-72. Everett testified that the class characteristics present on the .40 caliber bullet recovered during Mattox's autopsy were similar to those made by Springfield Armory brand pistols. *Id.* at 452-53. Further, it was determined that the .40 caliber casings recovered from both the May 16, 2011 homicide matched

- 10 -

those recovered from the .40 caliber casings recovered from the scene of the 2011 Swissvale shootout. *Id.* at 451-54.

On May 30, 2012, the Commonwealth filed notice of its intent to present evidence, pursuant to Pa.R.E. 404(b), of Crumbley's involvement in the June 2, 2011 shootout. The Commonwealth averred that the Ruger and Springfield Armory firearms associated with the June shootout linked Crumbley to the Mattox shooting on May 16, 2011. Thus, it sought to introduce testimony regarding the June 2 incident at the co-defendants' trial in order to prove identity. While Crumbley was obviously present at the June 2 incident, Appellant was not; thus, he argued that the evidence was prejudicial and, therefore, inadmissible against him. Following a hearing, the trial court ruled that the evidence was admissible at the joint trial, and denied the motion *in limine*.

"When reviewing the denial of a motion *in limine,* we apply an evidentiary abuse of discretion standard of review." ***Commonwealth v. Stokes***, 78 A.3d 644, 654 (Pa. Super. 2013) (citation omitted). "The admissibility of evidence is a matter directed to the sound discretion of the trial court, and an appellate court may reverse only upon a showing that the trial court abused that discretion." ***Id.*** (citation omitted).

The crux of Appellant's argument is that evidence recovered from the June 2, 2011 incident involving Crumbley has no bearing on Appellant's identity as one of the shooters involved in the May 16, 2011 death of

Mattox. Appellant's Brief at 46. However, this argument fails to acknowledge that Appellant and Crumbley were joined for trial.[3] The co-defendants herein did not object to joinder. Indeed, "joint trials are preferred where conspiracy is charged." *Commonwealth v. Housman*, 986 A.2d 822, 834 (Pa. 2009) (citation omitted).

Pennsylvania Rule of Evidence 404(b) governs admissibility of evidence of other bad acts.[4]

> Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact.
>
> The Commonwealth must prove beyond a reasonable doubt that a defendant has committed the particular crime of which he is accused, and it may not strip him of the presumption of innocence by proving that he has committed other criminal acts.

*Commonwealth v. Ross*, 57 A.3d 85, 98–99 (Pa. Super. 2012) (*en banc*) (citations omitted).

---

[3] The Rules of Criminal Procedure provide that "[d]efendants charged in separate indictments or informations may be tried together if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Pa.R.Crim.P. 582(A)(2).

[4] Rule 404(b) does not distinguish between prior and subsequent acts. *Commonwealth v. Wattley*, 880 A.2d 682, 687 (Pa. Super. 2005).

Here, the trial court properly admitted the evidence related to the June 2, 2011 incident as probative of the identity of Crumbley and his involvement in the May 16, 2011 shooting that resulted in the death of Mattox. **See** Trial Court Opinion, 6/25/2014, at 23-28. Of significance, we note that the trial court offered a limiting instruction concerning this testimony, which was rejected by both Crumbley's counsel and Appellant.[5] N.T., 8/20-9/4/2012, at 1318-23, 1411-12.

---

[5] We find instructive the following portion of Justice Saylor's concurring and dissenting opinion in **Commonwealth v. Housman**, 986 A.2d 822, 848 (Pa. 2009) (Saylor, J., concurring and dissenting).

> In **Zafiro v. United States**, 506 U.S. 534, 539, [] (1993), the high Court opined that when defendants have properly been joined, a district court should only grant severance if there is a serious risk that a joint trial "would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." **Id.** at 539 [].

> The Court went on to say that where evidence is admitted at a joint trial that would not be admissible in a separate trial, a defendant might be prejudiced:

>> Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory

- 13 -

In light of the forgoing, following our review of the certified record, the parties' briefs, and the relevant law, we conclude that the opinion of the Honorable Beth A. Lazzara thoroughly and correctly addresses and disposes of Appellant's second issue and supporting arguments and evidences no abuse of discretion or errors of law. Accordingly, we adopt section C of the trial court's opinion, pages 23 through 28, filed on June 25, 2014, as our own and hold, based upon the reasons stated therein, that the trial court committed neither an error of law nor an abuse of discretion in denying the co-defendants' motion *in limine*.

In his third claim of error, Appellant asks this Court to consider whether the trial court erred in failing to grant a motion, filed by Crumbley and joined by Appellant, that sought suppression of Robinson's pre-trial identification of the co-defendants due to the "highly suggestive" nature of the administered photo arrays. Appellant's Brief at 40-63. Appellant also

---

> evidence that would be available to a defendant tried alone were unavailable in a joint trial. The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated in *Richardson v. Marsh*, **less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice**. [See 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)].

> *Zafiro*, 506 U.S. at 539 [] (internal citations omitted).

**Housman**, at 848 (emphasis added).

argues that the suggestive pre-trial procedure tainted Robinson's in-court identification, and admission of both was in error. *Id.*

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.
>
> [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts. Moreover, it is within the lower court's province to pass on the credibility of witnesses and determine the weight to be given to their testimony.
>
> When determining the admissibility of identification testimony, this Court has held that suggestiveness in the identification process is a factor to be considered in determining the admissibility of such evidence, but suggestiveness alone does not warrant exclusion. A pretrial identification will not be suppressed as violative of due process rights unless the facts demonstrate that the identification procedure was so infected by suggestiveness as to give rise to a substantial likelihood of irreparable misidentification.
>
> Due process does not require that every pretrial identification of witnesses must be conducted under laboratory conditions of an approved lineup. In reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable.
>
> Additionally, the purpose of a suppression order regarding exclusion of identification evidence is to prevent improper police action. Thus, where a defendant does not show that improper police conduct resulted in a suggestive identification, suppression is not warranted.

- 15 -

*Commonwealth v. Jaynes*, 135 A.3d 606, 610 (Pa. Super. 2016), *appeal denied*, 145 A.3d 724 (Pa. 2016) (citations and quotation marks omitted).

Once more, our thorough review of the certified record, the parties' briefs, and the relevant law leads us to conclude that the opinion of Judge Lazzara thoroughly and correctly addresses and disposes of this issue and evidences no abuse of discretion or errors of law. Accordingly, we adopt section B of the trial court's opinion, pages 15 through 23, filed on June 25, 2014, as our own and hold, based upon the reasons stated therein, that the trial court committed neither an error of law nor an abuse of discretion in denying the co-defendants' suppression motion, nor did the court err in permitting Robinson's in-court identification of the co-defendants.

In his final claim of error, Appellant contends that imposition of mandatory minimum sentences at counts three and six is illegal under *Alleyne v. United States*, 133 S.Ct. 2151 (2013).[6] Appellant's Brief at 64-67. The Commonwealth concedes that this case must be remanded for resentencing because the applicable statute, 42 Pa.C.S. § 9712, has been found unconstitutional. Commonwealth's Brief at 54; *see Commonwealth v. Newman*, 99 A.3d 86, 104 (Pa. Super. 2014) (*en banc*) (holding the mandatory minimum sentencing scheme under section 9712 unconstitutional pursuant to *Alleyne*). *See also Commonwealth v. Valentine*, 101 A.3d

---

[6] In *Alleyne*, the Supreme Court held that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury" and found beyond a reasonable doubt. *Alleyne*, 133 S. Ct. at 2155.

801 (Pa. Super. 2014). We agree. Because section 9712 has been invalidated by *Alleyne*, and Appellant is currently appealing from his judgment of sentence, we vacate the illegal, mandatory minimum terms imposed at counts three and six, and remand for resentencing on those charges.

In sum, we affirm Appellant's convictions, but vacate his judgment of sentence as to count three (robbery of a motor vehicle) and count six (conspiracy to commit robbery - serious bodily injury), and remand for resentencing. The parties shall attach a copy of the trial court's June 25, 2014 opinion to this memorandum in the event of future proceedings.

Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/21/2017

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA,    No. CR 2820-2012

v.

THADDEUS CRUMBLEY,

Defendant.


COMMONWEALTH OF PENNSYLVANIA,    No. CR 2821-2012

v.

MATTHEW EBO,    OPINION

Defendant.    BETH A. LAZZARA, JUDGE
Court of Common Pleas

Copies Sent To:

Michael W. Streily, Esquire
Office of the District Attorney
Allegheny County Courthouse
Pittsburgh, PA 15219

Sally Frick, Esquire
437 Grant Street
Suite 407
Pittsburgh, PA 15219

Jessica L. Herndon, Esquire
Office of the Public Defender
400 County Office Building
542 Forbes Avenue
Pittsburgh, PA 15219

THE COURT OF COMMON PLEAS
OF ALLEGHENY COUNTY, PENNSYLVANIA


COMMONWEALTH OF
PENNSYLVANIA,

CRIMINAL DIVISION

vs.

CC: 2820-2012

THADDEUS CRUMBLEY,

Defendant.

COMMONWEALTH OF
PENNSYLVANIA,

CRIMINAL DIVISION

vs.

CC: 2821-2012

MATTHEW EBO,

Defendant.


**OPINION**

This is an appeal following the imposition of sentences to life imprisonment for both Defendants following a jury trial in which both Defendants were found guilty of First Degree Murder, Robbery -- Serious Bodily Injury, Robbery -- Motor Vehicle, Carrying a Firearm without a License, Conspiracy -- Robbery and Conspiracy – Murder. The trial occurred between August 22, 2012 and September 4, 2012, and the Defendants were sentenced on November 28, 2012. On appeal, the Defendants have raised numerous allegations of error, which will be set forth and discussed below. Many of the issues raised by the

Defendants are identical, which is why this court has chosen to address them in a single opinion.

## I.    ALLEGATIONS OF ERROR

The Defendants have raised numerous allegations of error in their Concise Statements of Matters Complained of on Appeal. These are listed below, by Defendant, and it is further noted at which section of this opinion the alleged error is discussed.

*Defendant Crumbley:*

1. The court failed to exclude the testimony of Saday Robinson due to alleged violations of Pa. R. Crim. Proc. 573. (Section III. A.)

2. The court failed to exclude the testimony of Saday Robinson due to police taint or bias in the identification. (Section III. B.)

3. The court erred in admitting evidence of a subsequent shooting involving Defendant Crumbley, failed to give a limiting instruction regarding the evidence and failed to exclude evidence relating to a Ruger handgun. (Section III. C.)

4. The court failed to either strike a comment, or provide a curative instruction related to the comment, made by the Assistant District Attorney referring to Defendant Crumbley as "the Angel of Death." Additionally, Defendant Crumbley has alleged ineffective assistance of counsel due to his counsel's lack of objection to the comment. (Section III. D.)

2

5. The court failed to exclude testimony of certain "jailhouse" witnesses due to alleged violations of Pa. R. Crim. Proc. 573. (Section III. E.)

6. The court failed to give a "missing witness" instruction as to witness Richard Carpenter. (Section III. F.)

7. The court violated Defendant Crumbley's right to a speedy trial by granting a continuance on June 7, 2012 (Section III. G.)

8. The evidence was insufficient to sustain the verdict. (Section III. H.)

9. The verdict was against the weight of the evidence. (section III. H.)

*Defendant Ebo:*

1. The court failed to exclude the testimony of Saday Robinson due to alleged violations of Pa. R. Crim. Proc. 573. (Section III. A.)

2. The court erred in admitting evidence of a subsequent shooting involving Defendant Crumbley, failed to give a limiting instruction regarding the evidence and failed to exclude evidence relating to a Ruger handgun. (Section III. C.)

3. The court failed to exclude the testimony of Saday Robinson due to police taint or bias in the identification. (Section III. B.)

4. The verdict was against the weight of the evidence. (section III. H.)

This court disagrees with the Defendants' allegations of error and asserts that it has committed no errors. This court requests that its rulings, the jury's verdict and the sentences of the Defendants be upheld.

3

## II.   FACTUAL BACKGROUND

On May 16, 2011, Todd Mattox was shot to death in the parking lot of the Leechburg Garden apartments in Penn Hills. (T.R. 8/20/12, p. 240)[1]. He had suffered three (3) gunshot wounds, two (2) to the trunk and one (1) fatal shot to the head. (T.R. 8/20/12, pp. 246-261, Ex. 4-16).

An eyewitness, Saday Robinson, described the sounds of an altercation above her apartment in the minutes before the shooting, followed by the noise of people running down stairs. (T.R. 8/20/12, pp. 527-528). She then saw Mr. Mattox being pushed out the front door of the apartment complex by two (2) African-American males with handguns. (T.R. 8/20/12, pp. 528-529). She was able to hear Mr. Mattox pleading for his life, offering the two (2) males everything that he had, and backing away from them with his hands up. (T.R. 8/20/12, pp. 529, 531). The eyewitness described seeing a man that she later identified as Defendant Ebo shooting at Mr. Mattox three (3) times. (T.R. 8/20/12, p. 531). Mr. Mattox fell to the ground after the gunshots were fired. (T.R. 8/20/12, p. 531). The witness then described seeing Defendant Ebo going through the pants pockets of Mr. Mattox

---

[1] The notation "T.R. 8/20/12" refers to Volumes I and II of the trial transcript for August 20, 2012 through September 4, 2012.

4

before she saw a person that she later identified as Defendant Crumbley walk up to Mr. Mattox, stand over his body as it lay in the parking lot, and shoot him directly in the head. (T.R. 8/20/12, pp. 532-534). She then indicated that she saw the Defendants get into Mr. Mattox's white Nissan and speed out of the parking lot. (T.R. 8/20/12, p. 534). Mr. Mattox's vehicle was later found after it had been set on fire on Hill Street in Penn Hills. (T.R. 8/20/12, pp.757-759, 762-780, 782-787, 804, 818, 841; Ex. 58-63, Ex. 66-67).

It should be noted that other witnesses corroborated key points contained in Ms. Robinson's description of the events that night. For example, John Gardone also testified that Mr. Mattox was chased by two (2) African-American males before he was shot several times in the parking lot of the Leechburg Gardens. (T.R. 8/20/12, pp. 591-592). He also saw the two (2) suspects enter a white vehicle and speed from the parking lot. (T.R. 8/20/12, pp. 492-493). Another witness, Yurri Lewis, heard multiple shots that day, although he did not witness the shooting. (T.R. 8/20/12, p. 513). He did, however, see an African-American male going through the pockets of a man lying in the parking lot of Leechburg Garden Apartments. (T.R. 8/20/12, p. 515). He saw the man who had been rifling through the victim's pockets enter a white car and speed out of the parking lot. (T.R. 8/20/12, p. 515). Detective Anthony Perry confirmed that the right front pants pocket of Mr. Mattox was pulled out when he arrived at the scene. (T.R. 8/20/12, pp. 302-304, 330-334, Ex. 41). The left front pocket was in its normal position. (T.R. 8/20/12, pp. 302-304).

5

Despite the fact that there were several eyewitnesses to the events that occurred on May 16, 2011, none of the witnesses interviewed by either Penn Hills police officers or Allegheny County detectives were able to positively identify the actors.

The Defendants became suspects in the Todd Mattox murder following a string of events occurring over the course of the several months following the slaying. On June 2, 2011, Defendant Crumbley was involved in a shooting in Swissvale, in which he was shot several times. (T.R. 8/20/12, pp. 855-858). Two types of shell casings were recovered from the scene, including the same type of shell casings that were found at the Todd Mattox murder scene, those being from a .40 caliber Smith and Wesson Springfield Armory pistol. (T.R. 8/20/12, pp. 885-886). A friend of Defendant Crumbley's, Asa Thompkins, was present at the scene of the shooting. (T.R. 8/20/12, pp. 847, 852). One week later, on June 9, 2011, Asa Thompkins was pulled over for a traffic stop in South Park. (T.R. 8/3/12, p. 20; T.R. 8/20/12, p. 1009). A Springfield Armory pistol was found under the front passenger seat of the car, and Mr. Thompkins said that the gun was his. (T.R. 8/20/12, pp. 1010-1011).

6

On September 6, 2011, Thomas Julian Brown wrote a letter from the Allegheny County jail to Detective Garlicki, of the Allegheny County police, asking that he be put in touch with the detective who was handling the Todd Mattox homicide. (T.R. 8/20/12, p. 697). He indicated that he was willing to provide information on that case. (T.R. 8/20/12, pp. 697-698). Mr. Brown further indicated that he had heard, several months earlier, Defendant Crumbley saying that he had "smoked" Todd Mattox. (T.R. 8/20/12, pp. 698-699). Mr. Brown's cousin was Asa Thompkins, and Mr. Brown's son, Leron Brown, was a friend of Defendant Crumbley. (T.R. 8/20/12, pp. 695-696). Leron Brown was found shot dead in January or February 2012, inside a car with Roman Herring, a cousin of Defendant Crumbley's, who was also found dead in that same car. (T.R. 8/20/12, pp. 948, 991). Roman Herring was allegedly involved in the burning of a vehicle on Hill Street in Penn Hills. (T.R. 8/20/12, p. 945).

Defendant Crumbley became a suspect in the Todd Mattox murder In September 2011, after Detective Anthony Perry received a report connecting the handguns used in the Todd Mattox homicide with the weapons used in the Swissvale shooting on June 2, 2011, and after witness Thomas Brown came forward with information about the homicide. (T.R. 8/20/11, pp. 1017, 1020, 1021, 1025). Defendant Ebo also became a suspect at that time. (T.R. 8/20/11, p. 1017).

7

## III.    ARGUMENT

### A. Alleged Discovery Violation regarding Saday Robinson

The Defendants' first allegation of error is that this court erred in admitting the testimony of eyewitness Saday Robinson. The Defendants argue that the testimony should have been excluded as a sanction for the Commonwealth's violation of Pa. R. Crim Proc. 573. The Defendants allege that the Commonwealth failed to provide full and timely discovery by failing to provide information to the Defendants regarding Ms. Robinson's "misidentification" during presentation of a photo array.

During testimony taken on August 21, 2012 in connection with a pre-trial motion seeking exclusion of Ms. Robinson's identification of the Defendants on the basis that the identification was the product of bias and taint, Ms. Robinson indicated that, during one of the photo arrays prior to July 24, 2012, she had pointed to a photograph and said that the individual in the photograph "looked like" Defendant Ebo. (T.R. 8/20/12, pp. 59-61). However, this alleged misidentification was not reported in any police report by either Penn Hills officers or Allegheny County homicide detectives. (T.R. 8/20/12, p. 82). After Ms. Robinson's pretrial testimony about the alleged intentional misidentification, and defense counsel's request for any report that detailed the misidentification, this court advised the Commonwealth that, if discovery related to the

9

misidentification was not turned over to the Defendants, Ms. Robinson would not be permitted to testify. (T.R. 8/20/12, p. 83).

The following day, while the jury was at lunch, Assistant District Attorney Steven Stadtmiller indicated that, after speaking with the officers involved in the investigation, he was advised that the misidentification did not occur. (T.R. 8/20/12, pp. 152-154). Detective Hitchings, who had shown Ms. Robinson the November 4, 2011 lineup, which was the first photo array to contain Defendant Ebo, indicated that no identification at all had occurred on that date. (T.R. 8/20/12, p. 153).

Ms. Robinson took the stand on August 22, 2012 to continue her testimony related to the pre-trial motion. (T.R. 8/20/12, p. 155). She again stated that she had previously pointed to someone who looked like Defendant Ebo in a photo array prior to July 24, 2012. (T.R. 8/20/12, pp. 166-167). Her clearest discussion of the issue was in the following exchange with Defense Attorney Wendy Williams:

Q.    Okay. Are you saying now that you mistakenly said that or that you were lying under oath yesterday?

A.    You are confusing me.

Q.    Did that in fact occur? Did you point to somebody else and say that this is the guy that did the crime?

10

A.    No, I said that this looks like the guy who did the crime.

Q.    Okay.  And you pointed to somebody other than Mr. Ebo and Mr. Crumbley?

A.    Yes.        (T.R. 8/20/12, p. 163).

Ms. Robinson also testified that the misidentification occurred when she was in a car with Detective Perry before her grandmother died. (T.R. 8/20/12, pp. 176-177). It should be noted that only the September 16, 2011 photo array meets all three (3) of these criteria.  Ms. Robinson also specifically denied that Detective Hitchings was present during the alleged misidentification. (T.R. 8/20/12, p. 176).

Following Ms. Robinson's testimony, Detective Anthony Perry took the stand and testified regarding the photo arrays that he had shown to Ms. Robinson. (T.R. 8/20/12, pp. 186-203). Detective Perry had shown Ms. Robinson two (2) photo arrays, one in June 2011 containing Asa Thompkins (T.R. 8/20/12, pp. 187, 189) and one in September 2011 containing Defendant Crumbley. (T.R. 8/20/12, p. 187). He did not show Ms. Robinson any photo arrays containing a picture of Defendant Ebo.  (T.R. 8/20/12, p. 188).  A photo array containing Mr. Ebo's photo was not prepared until October 2011, and that array was presented to Ms. Robinson in November, 2011 by Detectives Hitchings and Langan.  (T.R. 8/20/12, p. 188).    Detective Perry emphatically stated that any alleged misidentification by Ms. Robinson did not occur when he showed Ms. Robinson any photo arrays.  (T.R. 8/20/12, pp. 193, 195, 196).  He clearly stated that no

11

identifications at all were made when he presented photo arrays to her (T.R. 8/20/12, pp. 195-196), and that, had there been an identification, he would have followed his regimented protocol of having her circle or initial the person identified. (T.R. 8/20/12, p. 193).

Detective Steven Hitchings also provided testimony related to the issue of a misidentification. (T.R. 8/20/12, pp. 204-207). He indicated that he showed Ms. Robinson two (2) photo arrays on November 4, 2011, one containing a photo of Defendant Crumbley and the other containing a photo of Defendant Ebo. (T.R. 8/20/12, p. 204). Detective Hitchings clearly indicated that Ms. Robinson made no identifications from either photo array and, further, that she did not indicate that any of the photos "looked like" one of the actors. (T.R. 8/20/12, pp. 204-5, 206, 207). In fact, he was "absolutely sure" that no identifications occurred on November 4, 2011. (T.R. 8/20/12, p. 207).

Following the testimony of Ms. Robinson and Detectives Perry and Hitchings, this court found that there was conflicting evidence regarding any alleged discovery violation and any alleged misidentification, but stated that the issue could be revisited later, after further development of trial testimony, if necessary. (T.R. 8/20/12, pp. 214-215).

12

On appeal, the Defendants assert that the court erred in permitting Ms. Robinson to testify because the Commonwealth had not turned over police reports detailing a prior misidentification. Rule 573(e) of the Pennsylvania Rules of Criminal Procedure provides that, if a party has failed to comply with a discovery request, the court may, *inter alia*, prohibit a party from introducing the evidence not disclosed, or may order any other remedy that it deems just under the circumstances. Pa. R. Crim. P 573. The Commonwealth does not violate Rule 573 when it fails to disclose to the defense evidence that it does not possess and of which it is unaware. Com. v. Collins, 957 A.2d 237, 253 (Pa. 2008).

In this case, there was no clear evidence of a discovery violation at all, let alone one of such seriousness to justify complete exclusion of Ms. Robinson's testimony. There was clearly conflicting evidence as to whether a prior identification or misidentification had even occurred. While Ms. Robinson said that she had pointed to someone in a photo array and said it "looked like" Defendant Ebo, not a single detective who had presented a photo array to her had any recollection of this occurring. Each detective was also aware of his responsibility to place an identification or misidentification in a police report. (T.R. 8/20/12, pp. 193, 198, 205). None of the police reports indicate any identification occurred. (T.R. 8/20/12 p. 79; Ex. A, C). This court was presented with no evidence, facts or questioning from which it could conclude that any of the detectives testifying during pre-trial motions or who were involved in the

13

presentation of photo arrays to Ms. Robinson had lied, hid information or were in any way negligent or lacking in their duties.

In failing to find that an identification or misidentification occurred, this court is not indicating that it in any way disbelieved Ms. Robinson's testimony. On the contrary, Ms. Robinson was a tremendously compelling witness, who clearly became involved in this case against her best interests and all of the advice of her family and friends. It was obvious that she was terrified as she testified during the pre-trial motion proceeding, and again when she gave her trial testimony. Ms. Robinson shook and trembled throughout the entirety of her testimony. As to the misidentification, it is possible that she indicated to police that someone else "looked like" Mr. Ebo. It is also possible that she remembers thinking that someone looked like Mr. Ebo, but did not actually verbalize that thought to the detectives. Ms. Robinson even indicated at one point in her testimony that she did not tell the officers when she picked out the wrong person, with her answer being somewhat ambiguous as to whether she told the officers that she had picked someone or whether she told the officers that it was the wrong person. (T.R. 8/20/12, p. 67). It is also possible that she mentioned someone looking like Defendant Ebo to the detectives, but was so vague about it that the detectives did not consider it to be an "identification" as they understand that word. No matter what occurred at the time, there was no clear evidence of a discovery violation having occurred, and, therefore, this court did not err in failing to exclude evidence or testimony in order to cure a non-existent violation.

14

## B. *Alleged Error Regarding Tainted Identification Given by Saday Robinson*

Defendant Crumbley's second allegation of error, and Defendant Ebo's third allegation of error, is that this court erred in permitting Saday Robinson to testify because her identification was the product of taint and bias. More specifically, the Defendants assert that her identification of them on July 24, 2012 resulted from taint, bias and influence from the media exposure related to this case, from information provided to her by neighbors or friends, and from comments made by the police to her prior to that identification.

Questions regarding the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. Com. v. Kendricks, 30 A.3d 499, 503 (Pa. Super. 2011). An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a showing that the trial court's conclusion was the result of manifest unreasonableness, or partiality, prejudice, bias or ill-will, or such lack of support as to be clearly erroneous. Com. v. Brougher, 978 A.2d 373, 376 (Pa. Super. 2009).

A photographic identification is unduly suggestive if, under the totality of the circumstances, the identification procedure creates a substantial likelihood of

misidentification. Com. v. DeJesus, 860 A.2d 102, 112 (Pa. 2004). Photographs used in photo array line-ups are not unduly suggestive if the suspect's picture does not stand out more than those of the others, and the people depicted in the array all exhibit similar facial characteristics. Com. v. Fisher, 769 A.2d 1116, 1126 (Pa. 2001). The photographs in the array should all be the same size and should be shot against similar backgrounds. Kendricks, *supra*, at 504. When an out-of-court identification is alleged to be tainted, an in-court identification may still stand if, again considering the totality of the circumstances, the identification had an origin sufficiently distinguishable to be purged of the primary taint. Kendricks, *supra*, at 506. The factors a court should consider in determining whether there was an independent basis for identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness during the confrontation; and (5) the length of time between the crime and the confrontation. Com. v. Abdul-Salaam, 678 A.2d 342 (Pa. 1996).

Before Ms. Robinson testified in front of the jury at trial, this court heard lengthy testimony by her regarding the circumstances surrounding her identification of the Defendants, including her interviews by police, her exposure to media coverage of the case prior to her July 2012 identification of the Defendants, and information that she may have heard in the community regarding this murder. She was subjected to extensive cross-examination on these issues

16

by the attorneys for both Defendants. This court ultimately ruled that Ms. Robinson was permitted to testify and that she was permitted to provide testimony regarding her July 2012 identification of the Defendants. She was further permitted to make an in-court identification of the Defendants.

The Defendants assert that several factors tainted the identification of the Defendants by Ms. Robinson, including media exposure, information from neighbors identifying the alleged shooters and improper comments from the police. In terms of media exposure, it is true that there was media coverage of this case, which included televised and printed photos of the Defendants following their arrest, and there may have been media coverage of Mr. Crumbley as a result of the shooting in which he was a victim in early June 2011. Ms. Robinson denied seeing any such coverage repeatedly during her testimony regarding the pre-trial motion *in limine*.

Ms. Robinson moved from Allegheny County across the country in mid-October 2011. (T.R. 8/20/12, pp. 41, 68). Aside from a brief return to Pittsburgh in November 2011 for the funeral of her grandmother, she did not return to the area until July 2012, when detectives asked her to return to make an identification of the shooters. (T.R. 8/20/12, p. 42). Ms. Robinson testified that she saw no media coverage, pictures or video of the Defendants either before she left the area or after. (T.R. 8/20/12, p. 42). She specifically indicated that she saw no photos of

17

Defendant Crumbley prior to being shown the first photo array in September 2011. (T.R. 8/20/12, pp. 64, 68). She also denied seeing any media coverage from the time of the shooting until being contacted by telephone by detectives in late June, early July, 2012. (T.R. 8/20/12, pp. 70-71). She advised the detectives during that phone contact that she had seen no media coverage regarding the case. (T.R. 8/20/12, pp. 158-159). She also indicated that she did not have a computer until she started school, which did not occur until after October 2011, when she left Pennsylvania. (T.R. 8/20/12, pp. 157-158). The credible testimony in the case was that Ms. Robinson had seen no media coverage related to the Defendants prior to her identification of them in July 2012 as the shooters. It should be noted that Ms. Robinson testified consistently to this lack of exposure to media coverage during her trial testimony. (T.R. 8/20/12, pp. 624, 626-628).

During her pre-trial motion testimony, Ms. Robinson also addressed the issue of whether her identifications were the product of information from community members. On the night of the murder, a neighbor indicated to Ms. Robinson that "Mo" was the shooter. (T.R. 8/20/12, pp. 42-43). Later, a friend named Ace told her that "Mat-Mat" was responsible. (T.R. 8/20/12, p. 58). Ms. Robinson was clear that: she did not know Defendant Ebo to be called "Mo" prior to the shooting (T.R. 8/20/12, pp. 42-43); she did not know anyone named "Mo" prior to the shooting (T.R. 8/20/12, p. 169); she never learned Defendant Crumbley's name (T.R. 8/20/12, p. 68); she did not know Defendant Ebo's name when she saw him at the apartment complex (T.R. 8/20/12, pp. 169-170); she did

18

not know anyone named "Mat-Mat" (T.R. 8/20/12, p. 171); she never found out who "Mat-Mat" was (T.R. 8/20/12, p. 71); and she did not know anybody named "Mo" or "Mat-Mat" when she picked out Defendant Ebo's photo. (T.R. 8/20/12, pp. 178-179). Ms. Robinson was very clear that she selected the Defendants' photos from the photo arrays because she saw them shoot Mr. Mattox. (T.R. 8/20/12, pp. 44, 178-179). Again, the credible testimony did not support that Ms. Robinson's identification was in any way tainted, biased or even influenced by the comments made by her neighbor and friend.

Lastly, the issue of whether police comments had tainted Ms. Robinson's identification was explored. Ms. Robinson was contacted in late June or early July by detectives who asked her to return to Pittsburgh to look at photo arrays. At the time that she was contacted, she was told that two gentlemen had been arrested (T.R. 8/20/12, pp. 182, 183) and that the detectives thought that these men were responsible for the murder of Todd Mattox. (T.R. 8/20/12, pp. 174-175). At no point did the detectives tell her the names of who they thought was responsible for the shooting. (T.R. 8/20/12, p. 175). The detectives also did not suggest who they thought was responsible for the murder when they showed Ms. Robinson the photo arrays. (T.R. 8/20/12, p. 175). Ms. Robinson did have an understanding that photos of the responsible people were contained in the photo arrays that she was shown, but no detective told her that. (T.R. 8/20/12, pp. 183-185). Additionally, she was unaware that a trial was scheduled to begin at the point when the police contacted her in July, 2012. (T.R. 8/20/12, p. 183). The

19

credible testimony eliminated from further consideration this issue of possible taint from police comments in the identification of the Defendants by Ms. Robinson at the photo array in July, 2012.

Even though this court does not believe that there was any taint, bias or suggestion in Ms. Robinson's identifications, the court will note that there are strong independent bases supporting Ms. Robinson's identifications here. It has never been disputed that Ms. Robinson's vantage point from her apartment window gave her a clear view of Todd Mattox's murder. Her window was approximately 8-10 feet from the front door of the building and 70-80 feet from the parking lot. (T.R. 8/20/12, pp. 283, 1179; Ex. 28). According to Detective Perry, Ms. Robinson had the best vantage point to see the events that night. (T.R. 8/20/12, p. 377). There were no obstructions of her view of the parking lot from her window. (T.R. 8/20/12, p. 167). The Defendants were only ten (10) feet away from her during the incident, and it occurred while it was still light outside. (T.R. 8/20/12, pp. 168-169). Additionally, she indicated that the entire incident lasted ten (10) minutes, that she watched the entire incident, (T.R. 8/20/12, p. 178), and she had seen both Defendants in her apartment building prior to the shooting, (T.R. 8/20/12, pp. 44, 177-178), making them familiar to her at the time of the shooting.

What Ms. Robinson witnessed was a brutal, unprovoked shooting of a man begging for his life, and then the execution of a wounded, fallen man. Images from such violent events tend to remain imprinted in one's mind, especially the faces of the perpetrators of such a horrific event. Ms. Robinson indicated this herself during her trial testimony, stating that the faces of the Defendants were "stuck in her head." (T.R. 8/20/12, p. 547). While not exceptionally descriptive, Ms. Robinson did provide relatively accurate descriptions of the two men involved in this shooting, including skin tone, relative size and clothing. (T.R. 8/20/12, pp. 413, 590-593, 1166-1170). Even if her identification was in some way tainted by media coverage or comments from neighbors, friends or police, which this court strongly believes is not the case, Ms. Robinson certainly had independent bases upon which to make her July, 2012 identifications.

Although defense counsel focused on Ms. Robinson's failure to select either Defendant from previous photo array lineups as strong evidence that her July, 2012 identification must have been the product of taint or bias, this court instead focused on Ms. Robinson's understandable fear to be a witness in this case. Ms. Robinson was immediately interviewed after the shooting and made herself available for questioning. (T.R. 8/20/12, p. 540). However, even from this beginning interaction with the police, she was afraid, telling the police officers of her fear on the night of the shooting and inviting them into her apartment so that she would not be seen talking with them. (T.R. 8/20/12, p. 53). As was mentioned earlier, Ms. Robinson shook through the entirety of her testimony, both during

21

the pre-trial proceedings and at trial. Her entire demeanor reflected her fear of being involved in this case.

Ms. Robinson also certainly verbalized her fear during her trial testimony, indicating that she did not want involved in this case because of the culture in her community that perpetuated the phrase "snitches get stitches" (T.R. 8/20/12, pp. 535-536), a sentiment echoed by another witness to the shooting, John Gardone. (T.R. 8/20/12, pp. 493-494). Her fear throughout her involvement in the case was clear through her actions: by her waiting until her neighbors left before she talked to the police (T.R. 8/20/12, p. 535); by her taking the police into her apartment so no one would see her talking to them (T.R. 8/20/12, p. 53); by only agreeing to meet detectives elsewhere for subsequent meetings so that no one would see her talking to them (T.R. 8/20/12, p. 583); by her testimony that she deliberately failed to identify the Defendants in photo arrays even though she was sure that they were there (T.R. 8/20/12, p. 552); by the fact that she told Detective Perry that she moved because she was fearful (T.R. 8/20/12, p. 381); and by the fact that she finally identified the Defendants only after moving across the country and being informed that suspects were in custody. (T.R. 8/20/12, p. 550). Ms. Robinson's own family warned her that she should not become involved in this case for fear that something would happen to her if she did. (T.R. 8/20/12, p. 548).

This court does not believe that prior failures to identify the Defendants in any way support a contention that the identifications in July, 2012 were the result of taint, bias or suggestion. Rather, the prior failures to identify the Defendants were the product of a fear so intense that Ms. Robinson exhibited physical manifestations of that fear over fifteen (15) months after the incident that she witnessed. This court permitted Ms. Robinson to testify at trial regarding her eyewitness identification of the Defendants, finding that there was no media taint and no taint from community or police sources. There was an independent basis for her identification. (T.R. 8/20/12, pp. 214-215). This court's ruling in this regard is well-supported by the record and should be upheld.

## C. Alleged Error Regarding Admission of Evidence of June 2, 2011 Shooting

Defendant Crumbley's third allegation of error, and Defendant Ebo's second, is that this court erred in admitting testimony regarding the June 2, 2011 shooting in which Defendant Crumbley was a victim. More specifically, the Defendants assert that this evidence was improperly admitted under Pa. Rule of Evidence 404(b)(2), that this court erred in not granting the Defendants' Motion *in Limine* regarding the evidence and that the court erred in not providing a limiting instruction during trial.

There were two (2) arguments held on the issue of the admissibility of the June 2, 2011 shooting. The first took place on July 27, 2012, and the court ruled,

23

after argument, that the subsequent shooting involving Defendant Crumbley would be admissible as to the issue of identity only, i.e. to show that, because the same gun, a .40 caliber, was used in a shooting that occurred two (2) weeks after Mr. Mattox's shooting where Defendant Crumbley was present, it is circumstantial evidence that he was present at the Todd Mattox shooting where shell casings from the same gun were found. (T.R. 7/27/12, pp. 58-59).

On August 21, 2012, a second argument on the issue of the June 2, 2011 shooting took place. In this argument, the court entertained Defendants' Motion *in Limine* regarding a Ruger handgun found at the scene of the June 2, 2011 shooting in Swissvale. A Ruger handgun was found outside of the vehicle where the shooting had occurred, and Defendant Crumbley's blood was found on it. (T.R. 8/20/12, p. 10). Defendant Crumbley argued that the evidence of the Ruger was irrelevant to the May 6, 2011 shooting of Todd Mattox and was prejudicial to the Defendants in that all that it showed was that Defendant Crumbley must have had a gun in his hand in the Swissvale shooting so he must also have had a gun at the Todd Mattox shooting. (T.R. 8/20/12, pp. 11, 17). The Commonwealth argued that photos of the Ruger showed blood on the side of the gun and the barrel, which was identified as Defendant Crumbley's. (T.R. 8/20/12, p. 12). It was the intention of the prosecution to argue that Defendant Crumbley had the .40 caliber gun at the time of the Swissvale shooting, providing it with circumstantial evidence that Defendant Crumbley must have had that same gun two (2) weeks earlier when Todd Mattox was killed. (T.R. 8/20/12, p. 14). This court, with some

24

misgiving, ruled that evidence regarding the Ruger would be permitted, but would be limited to the issue of identity only. (T.R. 8/20/12, p. 20).

On August 30, 2012, counsel and this court discussed the closing jury instructions, including a court suggested limiting instruction based on Standard Jury Instruction 3.08 -- Evidence of Other Offenses as Proof of Guilt. (T.R. 8/20/12, p. 1317). Defendant Crumbley's attorney, Ms. Wendy Williams, stated that she did not want a limiting instruction regarding the June 2, 2011 shooting. (T.R. 8/20/12, p. 1318). This court read its proposed limiting instruction to all counsel:

> I [sic] have heard evidence tending to prove that the defendant Thaddeus Crumbley was involved in a shooting incident for which he is not on trial. I'm speaking of testimony to the effect that Mr. Crumbley was involved in a shooting incident in Swissvale on June 2, 2011. This evidence is before you for a limited purpose, that is for the identity of Mr. Crumbley as a participant in the May 16, 2011 incident at Leechburg Gardens. This evidence must not be considered by you in any way other than for the purpose I just stated. You must not regard this evidence as showing that the defendant, Mr. Crumbley, is a person of bad character or criminal tendencies from which you might be inclined to infer guilt. (T.R. 8/20/12, pp. 1318-1319).

The Commonwealth did not object to the limiting instruction, but Defendant Crumbley's attorney did, indicating that she would like time to think about it overnight, and would advise the court the next day prior to the closing instructions being read to the jury whether she wanted the instruction. (T.R. 8/20/12, p. 1321).

25

The following day, during Defendant Crumbley's closing argument, his attorney, Ms. Williams, addressed the June 2, 2011 shooting at length and reiterated the defense position that he was nothing more than a victim in that shooting. (T.R. 8/20/12, pp. 1363-1368). This court then again discussed its proposed limiting instruction with counsel outside the presence of the jury. (T.R. 8/20/12, p. 1411). Counsel for both Defendants agreed that they did not want the limiting instruction read to the jury. (T.R. 8/20/12, p. 1411). As such, this court did not give a limiting instruction in its closing charge to the jury.

A trial court's decision to grant or deny a Motion *in limine* is subject to an evidentiary abuse of discretion standard of review. Com. v. Reese, 31 A.3d 708, 715 (Pa. Super. 2011). Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. Com. v. Drumheller, 808 A.2d 893, 904 (Pa. 2002). Admissibility depends on relevance and probative value. Id. Evidence is relevant if it tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding a material fact. Id.

Evidence of other crimes may be admitted for other relevant purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident," though such evidence should only be

26

admitted if the probative value of the evidence outweighs its potential for prejudice. Pa. R.E. 404(b)(2)-(3), Com. v. Tedford, 960 A.2d 1, 37 (Pa. 2008). The particular prejudice that Rule 404(b)(3) seeks to prevent is the misuse of other-offense evidence. Specifically, the rule is designed to generally eliminate other-offense evidence, unless admissible for some specific purpose as indicated above, so that jurors do not convict a defendant simply because they perceive that the defendant has a bad character or a propensity to commit crimes. Reese, *supra*, at 723. Evidence that the defendant possessed a device or instrument that could have been the murder weapon is admissible. *See* Com. v. Miller, 897 A.2d 1281 (Pa. Super. 2006). Evidence will not be prohibited merely because it is harmful to the defendant. Com. v. Dillon, 925 A.2d 131, 141 (Pa. 2007). When other-offense evidence is admitted, the Defendant is entitled to request a jury instruction explaining to the jury that the specific evidence was only admitted for a limited purpose. Com. v. Billa, 555 A.2d 835, 841-842 (Pa. 1989). The trial court is permitted to use its own form of expression to explain difficult legal concepts to the jury. Com. v. Spotz, 759 A.2d 1280, 1287 (Pa. 2000).


Here, the evidence regarding the shooting on June 2, 2011 and the presence of the Ruger handgun were properly admitted. While certainly prejudicial to the Defendants, as all evidence tends to be, the evidence of the subsequent bad acts was relevant to make a fact in the case, i.e., whether Defendant Crumbley was present at the scene of the Todd Mattox murder two (2) weeks earlier, more or less probable. The evidence also was relevant to support

27

the inference that Defendant Crumbley was in possession of the .40 caliber gun used in Mr. Mattox's murder. Clearly, the evidence of the June 2nd shooting is not dispositive of these issues, but there is no requirement in the law that the evidence of other bad acts be dispositive on some disputed issue. The jurors had the opportunity to hear effective cross-examination on the evidence presented, as well as hear the informed arguments of all counsel on the relevance of the subsequent shooting.

The fact that the jurors found the Defendants guilty of all charges does not mean that they misused the evidence of the June 2nd shooting. Certainly, the strength and compelling nature of the eyewitness testimony from the time of Mr. Mattox's murder led more to the verdict than evidence of this subsequent event. This court committed no error in the admission of this evidence.

### D. Error Regarding "Angel of Death" Comment in Commonwealth's closing

Defendant Crumbley's fourth allegation of error is that this court failed to strike the "Angel of Death" comment made by Assistant District Attorney Stadtmiller in his closing, and that this court failed to give a curative instruction to the jury regarding this same comment. On appeal, Defendant Crumbley also asserts that he was denied effective assistance of counsel when his attorney failed to object to the comment or request a curative instruction.

28

In his closing on behalf of the Commonwealth, Assistant District Attorney Steven Stadtmiller made the following statement: "She (Saday Robinson) wasn't afraid to say that and describe him (Matthew Ebo), but that angel of death over there, Thaddeus Crumbley, with his hood up, that has what it takes to walk up to a man, stand over him and blow his brains out, she wasn't as hot on identifying." (T.R. 8/20/12, p. 1437). No objection was made by either defense attorney at the time that the comment was made or immediately following the Commonwealth's closing. In fact, this issue was not raised at all until Defendant Crumbley's Post-Trial Motion.

A prosecutor must have reasonable latitude to present his case to the jury, and he must be free to present his arguments with "logical force and vigor." Com. v. D'Amato, 526 A.2d 300, 309 (Pa. 1987). Comments by a prosecutor do not constitute reversible error unless the "unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." Id. The prejudicial effect of the prosecutor's remarks must be evaluated in the context in which they occurred. Id. When no objection has been made to the allegedly improper comments, the trial court has been deprived of its opportunity to rule on the propriety of the comments and then render cautionary instructions to cure any potentially prejudicial impact. Id. at 312. The

29

reviewing court must assess counsel's performance in failing to make an objection or request other relief by examining the effectiveness of counsel's representation. Id. Specifically, the trial court should examine whether the objection or request would have had arguable merit, and, if so, whether counsel had any reasonable basis to not make the objection, which would further his client's interests. Id. The court should also consider whether the omission by counsel could have prejudiced the defendant. Id.


It must first be noted that Assistant District Attorney Stadtmiller's comment was a brief, isolated statement. The language quoted above was the only such reference to the "Angel of Death" or anything that could be construed to be Biblical in nature made during the Commonwealth's closing or, as a matter of fact, at any time during the trial. Assistant District Attorney Stadtmiller certainly did not attach this phrase to Defendant Crumbley's name at each mention of him or refer to Defendant Crumbley by this phrase instead of using his name. Given the context of the single use of the phrase, this court does not deem its use in this instance to be improper, inflammatory or unduly prejudicial. This court did not err by failing to *sua sponte* give a curative instruction. This court was never asked to give such an instruction, and so did not do so. Throughout the closings by the Defendants and the Commonwealth, numerous sidebars were held to address statements made by counsel (T.R. 8/20/12, pp. 1369-1370, 1386-1388, 1394-1395), and, at one point, this court gave a curative instruction to address an improper comment by Defendant Crumbley's counsel. (T.R. 8/20/12, p. 1396).

30

Counsel for all parties were certainly aware that this court would hear them on any objection and was willing to provide curative instructions to the jury.

Further, this court does not believe that Ms. Wendy Williams, Defendant Crumbley's counsel, was in any way ineffective for failing to object or request a curative instruction. Had Ms. Williams did as Defendant Crumbley now suggests, she would have been calling attention to a phrase that most people in the courtroom never registered in their minds, given the brevity of the mention. Had she objected and requested a curative instruction, this court would have been forced to repeat the phrase in order to tell the jury to disregard it. This would have done nothing more than increase the impact of the comment and lodge it more firmly in the jurors' minds. Counsel for Defendant Crumbley is very a experienced and skilled trial lawyer, and she is most certainly not ineffective in this court's eyes for allowing a comment to pass essentially unnoticed and unregarded, as opposed to drawing significantly more attention to it. It must also be noted that this court, in its opening comments and closing instructions to the jury, advised the members of the jury on several occasions that the arguments of counsel are not evidence. (T.R. 8/20/12, pp. 101-102, 1455). The jurors were certainly aware that Mr. Stadtmiller's singular comment regarding Defendant Crumbley was no more than passionate, and perhaps overstated, argument.

This court did not err in regard to this single comment made by the Assistant District Attorney. This court neither struck the comment nor gave a curative instruction, because neither was requested. Defendant Crumbley's attorney was not ineffective. She made a judgment call that was in the best interest of her client to not call attention to the phrase. This court should be upheld in this regard.

### E. Alleged Discovery Violations regarding "Jailhouse" Witnesses

Defendant Crumbley's fifth allegation of error is that this court erred in permitting jailhouse informants to testify without the Commonwealth delivering timely discovery in violation of Pa. R. Crim. Proc. 573. This allegation of error pertains specifically to discovery involving "jailhouse" witnesses Richard Carpenter and Thomas Julian Brown.

Defendant Crumbley filed a discovery motion on June 8, 2012, which was argued before this court on July 27, 2012. During this motion, Defendant Crumbley requested additional information regarding Richard Carpenter's involvement in the witness protection program. At that time, Detective Perry answered defense counsel's questions regarding the details of this program. (T.R. 7/27/12, pp. 30-32). This appears to have satisfied Defendant Crumbley's discovery request regarding the witness protection program as no further requests were made regarding this subject.

32

Discovery issues were raised again by Defendant Crumbley on the morning of August 22, 2012, prior to the beginning of the jury trial. Defense counsel requested additional discovery on Thomas Julian Brown (T.R. 8/20/12, pp. 84-87, 88-89) and Richard Carpenter (T.R. 8/20/12, pp. 87-88). This court advised the Commonwealth that, if this discovery was not provided to the Defendants, these witnesses would not be permitted to testify. (T.R. 8/20/12, pp. 88-89). Later that same afternoon, on August 22, 2012, Defendant Crumbley again raised issues regarding discovery requests not being provided to the defense, specifically in relation to Mr. Brown's testimony in other cases on behalf of the Commonwealth. (T.R. 8/20/12, pp. 216-219). This court advised the Commonwealth that this discovery would have to be provided to the Defendants prior to Mr. Brown testifying at trial. (T.R. 8/20/12, p. 219). Counsel received the requested discovery the following day, on August 23, 2012. (T.R. 8/20/12, p. 326).

Mr. Brown took the witness stand and began his testimony on August 24, 2012. On August 28, 2012, after Mr. Brown's first day of testimony, Defendant Crumbley requested additional discovery related to Mr. Brown, including records from his prior criminal cases and detainers related to those cases. (T.R. 8/20/12, pp. 753-755). The Commonwealth indicated that it did not have these records, and this court instructed the Commonwealth to provide whatever it had related to Defendant Crumbley's request to the Defendants. (T.R. 8/20/12, p. 754). It should

be noted that Mr. Carpenter ultimately failed to appear for trial and did not testify. Thus, any allegations of error to exclude his testimony are moot.

Despite these alleged discovery issues, defense counsel conducted a thorough cross-examination of a variety of witnesses regarding Richard Carpenter and Thomas Brown. For example, Detective Perry was questioned extensively regarding money paid to Richard Carpenter as part of the witness protection program. (T.R. 8/20/12, pp. 1026-1044, 1037-1040, 1041-1043). Assistant District Attorney Mark Tranquilli, who was called as a Commonwealth witness regarding Richard Carpenter's detainer on a Judge Cashman case, was also subjected to a thorough cross-examination by defense counsel. (T.R. 8/20/12, pp. 1117-1132, 1142-1148). Mr. Tranquilli, now Judge Tranquilli, was also questioned at length regarding Thomas Brown's involvement as a witness in other criminal cases. (T.R. 8/20/12, pp. 1132-1142). Defendant Crumbley called as a witness Assistant District Attorney Christopher Stone to discuss Mr. Carpenter's sentence on the Judge Cashman case (T.R. 8/20/12, pp. 1219-1236), and he also called Thomas Brown's probation officer, Robert Tutko, who provided detailed information on his dealings with Mr. Brown, including the detainers that he had and the terms of his probation. (T.R. 8/20/12, pp. 1187-1216).

As was previously stated, questions regarding the admission and exclusion of evidence are within the sound discretion of the trial court and will

34

not be reversed on appeal absent an abuse of discretion. Kendricks, *supra,* at 503. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a showing that the trial court's conclusion was the result of manifest unreasonableness, or partiality, prejudice, bias or ill-will, or such lack of support as to be clearly erroneous. Brougher, *supra* at 376. Rule 573(e) provides that, if a party has failed to comply with a discovery request, the court may, *inter alia,* prohibit a party from introducing the evidence not disclosed, or may order any other remedy that it deems just under the circumstances. Pa. R. Crim. P 573. The Commonwealth does not violate Rule 573 when it fails to disclose to the defense evidence that it does not possess and of which it is unaware. Collins, *supra,* at 253.

Furthermore, a discovery violation does not automatically warrant relief in the form of a new trial. Com. v. Jones, 668 A.2d 491, 513 (Pa. 1995). A defendant seeking relief from a discovery violation must demonstrate prejudice. Com. v. Hood, 872 A.2d 175, 181 (Pa. Super. 2005). Courts have held that discovery turned over the day prior to trial is nonetheless admissible if the defendant is not otherwise prejudiced by the delay. *See* Jones, *supra*; Com. v. Boring, 684 A. 2d 561 (Pa. Super. 1996); Com. v. Gordon, 528 A.2d 631 (Pa. Super. 1987).

Here, the appropriate remedy for any discovery violations was not to exclude the testimony of either witness. All information possessed by the

35

Commonwealth was turned over to the Defendants, albeit late. The defense attorneys never complained that they had insufficient time to review the information, nor did they request additional time to do so. This court certainly would have granted any such requests. The attorneys for the Defendants were able to thoroughly question all witnesses after receiving this information. Additionally, given the lengthy and thorough cross-examinations of Mr. Brown and witnesses having knowledge of Mr. Brown, as well as the ability to call witnesses with knowledge of Mr. Brown on behalf of the Defendants, any delay in turning over discovery certainly did not hamper or adversely impact the defense in this case. Not every discovery violation justifies exclusion of witness testimony. This court ensured that discovery was turned over, and the Defendants ability to effectively cross-examine and present witness testimony was not impeded by any delays. This court committed no error in failing to exclude Mr. Brown's testimony.

### F. Alleged Error for Failure to Give a Missing Witness Charge

Defendant Crumbley's sixth allegation of error is that this court erred in failing to charge the jury on the missing witness instruction with regard to Richard Carpenter. Defendant Crumbley also asserts that, in its closing charge to the jury, this court committed error by mentioning "testimony" by Richard Carpenter even though Mr. Carpenter never appeared and never took the witness stand.

36

The missing witness adverse inference rule provides that, when a potential witness is available to only one of the parties to a trial, and it appears that the witness has special information material to the issues at trial, and the witness's testimony would not merely be cumulative, if such party does not produce the testimony of this witness, the jury may draw an inference that the witness's testimony would have been unfavorable to the party having control of the witness. Com. v. Boyle, 733 A.2d 633, 638 (Pa. Super. 1999).

The missing witness instruction should not be given every time that a witness does not testify. In fact, our appellate courts have set forth circumstances under which the missing witness instruction should not be given, including circumstances where: (1) the witness is so hostile or prejudiced against the party expected to call him that there is a small possibility of obtaining unbiased truth; (2) the testimony of such a witness is comparatively unimportant, cumulative, or inferior to that already presented; (3) the uncalled witness is equally available to both parties; (4) there is a satisfactory explanation as to why the party failed to call such a witness; (5) the witness is not available or not within the control of the party against whom the negative inference is desired; and (6) the testimony of the uncalled witness is not within the scope of the natural interest of the party failing to produce him. Com. v. Evans, 664 A.2d 570, 573-574 (Pa. Super. 1995). The relevant inquiry in reviewing a trial court's failure to give a

jury instruction is whether such charge was warranted by the evidence in the case. Boyle, *supra*, at 639. If the instruction proffered is inapplicable and improper, the court should not charge on it. Id.

In the case at issue, Detective Perry provided testimony during cross-examination by Defendant Crumbley's attorney that Richard Carpenter positively identified the Defendants in photo arrays on December 5, 2011. (T.R. 8/20/12, pp. 364-365). This identification led to the arrest of Defendant Crumbley on December 7, 2011. (T.R. 8/20/12, p. 366). Carpenter was in jail when he became a witness in this case, and he is identified as Witness #1 in the Affidavit of Probable Cause. (T.R. 8/20/12, pp. 367, 373). Mr. Carpenter never appeared to testify during the trial, despite being served with a subpoena. (T.R. 8/20/12, pp. 324-325). In fact, a bench warrant was issued due to his failure to appear. (T.R. 8/20/12, p. 325). Although he was referenced many times throughout the trial by all parties, he was unable to be located by the Commonwealth and would not answer phone calls to determine his whereabouts. (T.R. 8/20/12, p. 325).

Before discussion of the closing charge, Ms. Williams requested, on behalf of Defendant Crumbley, that Standard Criminal Jury Charge 3.21A be given by the court. As proposed by Defendant Crumbley, the missing witness instruction would have read as follows:

38

### 3.21A (Crim)      FAILURE TO CALL POTENTIAL WITNESS

1.      There is a question about what weight, if any, you should give to the failure of the Commonwealth to call Richard Carpenter as a witness.

2.      If three factors are present, and there is no satisfactory explanation for a party's failure to call a potential witness, the jury is allowed to draw a common-sense inference that his testimony would have been unfavorable to that party. The three necessary factors are:

*First*, the person is available to that party only and not to the other;

*Second*, it appears the person has special information material to the issue; and

*Third*, the person's testimony would not be merely cumulative.

3.      Therefore, if you find these three factors present, and there is no satisfactory explanation for the Commonwealth's failure to call Richard Carpenter to testify, you may infer, if you choose to do so, that his testimony would have been unfavorable to the Commonwealth.

During discussion of the closing jury instructions, this court advised counsel that it would not give Standard Criminal Jury Instruction 3.21A in regards to Richard Carpenter, reasoning that it was not an accurate representation of the situation involving Mr. Carpenter. The Commonwealth did not **fail** to call Mr. Carpenter as a witness. The Commonwealth, rather, could not locate him because he failed to comply with his subpoena. (T.R. 8/20/12, p. 1310). Additionally, this court believed that the charge, if given, would have required the jury to speculate as to whether the criteria in the charge had been met since no information was provided to the jury regarding the first factor in the charge. There was no testimony or discussion from which the jury could find that Mr. Carpenter was available only to the Commonwealth. While certainly it was in the

Commonwealth's interest to call Mr. Carpenter as a witness in its case, there was nothing to preclude or prohibit the defense from contacting and/or calling Mr. Carpenter as far as this court is aware. The situation that was presented to the court regarding the missing witness charge was squarely addressed in Evans, *supra,* and Boyle, *supra.*

Additionally, to assert the missing witness instruction against the Commonwealth, not only must the witness be solely and only available to the Commonwealth, but none of the other exceptions above must apply. Com. v. Culmer, 604 A.2d 1090, 1098 (Pa. Super. 1992). As was stated previously, there was no evidence that Mr. Carpenter was only available as a witness to the Commonwealth. Even if it is the case that he was only available to the Commonwealth, another exception applies, namely, that there is a satisfactory explanation as to why the Commonwealth failed to call the witness. The Commonwealth was unable to call Mr. Carpenter because he failed to appear pursuant to his subpoena, which resulted in a bench warrant being issued for his arrest. Thus, the court did not err in refusing to charge the jury with the missing witness instruction.

As to the Defendant's assertion that this court referred to Mr. Carpenter's testimony in its closing, this court read the following instruction to the jury:

> You have heard evidence that some of the witnesses- John Gardone- they have been convicted of crimes. John Gardone was convicted of the crime of theft by unlawful taking; Richard Carpenter was adjudicated delinquent for burglary and Thomas Julian Brown pled guilty to theft by unlawful

40

taking and has been convicted of theft by unlawful taking and burglary. The only purpose for which you may consider this evidence of prior conviction is deciding whether or not to believe all or part of the testimony of John Gardone, Richard Carpenter or Thomas Julian Brown. In doing so, you may consider the type of crime committed and how it may effect the likelihood that John Gardone, Richard Carpenter or Thomas Julian Brown have testified truthfully in this case. (T.R. 8/20/12, pp. 1470).

Mr. Carpenter himself did not testify in this case. However, his identification of the Defendants as the shooters in this case was testified to by Detective Perry under cross-examination by Defendant Crumbley's attorney. (T.R. 8/20/12, pp. 364-367). When Detective Perry was recalled to the stand on August 29, 2012, he was extensively questioned again regarding Richard Carpenter by both defense attorneys and the Commonwealth on re-direct. (T.R. 8/20/12, pp. 1026-1034, 1043-1044, 1037-1040, 1041-1043). Mr. Carpenter was also discussed extensively by Assistant District Attorneys Mark Tranquilli and Chris Stone, especially in regard to his criminal record. Defense witness Rachel Bundy also testified with regard to Richard Carpenter, stating that he could not have witnessed the shooting. (T.R. 8/20/12, pp. 127, 1273, 1275).

Given all of the testimony with regard to Richard Carpenter, which included his identification of the Defendants, the jurors were placed in a position where they could be required to evaluate Mr. Carpenter's credibility, even though he did not testify himself. Because of this potential issue with Mr. Carpenter's credibility and the extensive discussion of his criminal record, this court believed it to be most prudent to include him in the afore-mentioned charge. If this mention of

41

"testimony" with regard to Richard Carpenter was error, it was clearly harmless error, as everyone involved in this matter was aware that Richard Carpenter had not actually testified. The harmless error doctrine reflects the reality that the accused is entitled to a fair trial, not a perfect trial. Reese, *supra*, at 719.

G. *Alleged Error with Regard to Granting a Continuance.*

Defendant Crumbley's seventh allegation of error is that he was denied his right to a speedy trial when this court granted the Commonwealth's request for a postponement on June 8, 2012 due to the unavailability of several Commonwealth witnesses. The Defendant asserts that the Commonwealth did not show due diligence in bringing the case to trial, and he was prejudiced because Saday Robinson identified the Defendants subsequent to this postponement.

The trial for the Defendants was scheduled to begin on June 7, 2012. On June 7, counsel for Defendant Ebo, Mr. Randall McKinney, submitted a postponement, stating that he was not prepared to begin trial and had not had an opportunity to review all of the discovery that he had received from the Commonwealth. (T.R. 6/7/12, p. 3). Counsel for Defendant Crumbley objected to the postponement because he was prepared to proceed to trial. (T.R. 6/7/12, pp.

42

3-5). The Commonwealth consented to the postponement. (T.R. 6/7/12, p. 5). On June 8, 2012, counsel for Defendant Ebo withdrew his request for a continuance, prompting the Commonwealth to ask for a continuance because it needed additional time to locate three (3) essential Commonwealth witnesses. (T.R. 6/8/12, pp. 2-3). Both Defendants objected to the Commonwealth's request for a postponement, as they indicated that they were both ready to proceed, despite the fact that Defendant Ebo claimed that he was not ready to proceed just the day before, and that the 180 days to bring an incarcerated defendant to trial, mandated by Pa. R. Crim. Proc. 600, would run on June 17, 2012. (T.R. 6/8/12, p. 5).

This court granted the postponement due to the fact that the missing Commonwealth witnesses were essential to the Commonwealth's presentation of its case. This court then scheduled a new trial date, as well as set dates for jury selection, pre-trial motions and a status conference. (T.R. 6/8/12, p. 7). Both Defendants indicated that they would be filing bond motions given that the new trial date was beyond 180 days. (T.R. 6/8/12, p. 5).

On June 13, 2012, this court held a bail hearing. The Defendants asserted that the Commonwealth did not exercise due diligence in locating the missing witnesses that necessitated the postponement on June 8, 2012. Detective Anthony Perry of the Allegheny County Police, homicide division, testified

43

regarding his efforts to locate two missing Commonwealth witnesses, Saday Robinson and Yurri Lewis. (T.R. 6/13/12, pp. 30-38). Detective Perry stated that, on May 22, 2011, he had been given subpoenas for witnesses in advance of trial and began serving the subpoenas on May 24, 2012. (T.R. 6/13/12, pp. 33, 35). Trial preparation interviews were scheduled for May 30, 2012, and Detective Perry was unable to serve the subpoenas for Ms. Robinson and Mr. Lewis by that time. (T.R. 6/13/12, pp. 31, 34).

Detective Perry testified regarding his methods for locating witnesses, which began with checking the addresses on driver's licenses for witnesses and speaking with neighbors. (T.R. 6/13/12, p. 32). He also searched the Allegheny County jail search screen and public assistance records. (T.R. 6/13/12, pp. 31, 38). Despite using these search methods, Detective Perry was unable to locate the witnesses. (T.R. 6/13/12, pp. 31, 32). With regard to Yurri Lewis, Detective Perry also went to his address on three (3) separate occasions, but could not locate Mr. Lewis. (T.R. 6/13/12, p. 38). During his search for Saday Robinson, he went to at least four (4) addresses, but could not find her. (T.R. 6/13/12, pp. 31, 38). One address was abandoned and several were vacant. (T.R. 6/13/12, pp. 31, 38). He visited many of the addresses on more than one occasion, and he left business cards with people who might have contact with either witness. (T.R. 6/13/12, pp. 36-38). Detective Perry continued to look for both witnesses for the entire period between May 24, 2012 and the date of the bail hearing on June 13, 2012. (T.R. 6/13/12, pp. 32, 33-35). In fact, Detective Perry was finally able to

44

reach Ms. Robinson and speak with her on the night before this bail hearing. (T.R. 6/13/12, p. 33). This court denied the Defendant's request for bond and found that the Commonwealth had exercised due diligence in attempting to find the Commonwealth witnesses. (T.R. 6/13/12, p. 43).

Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. Com. v. Hunt, 858 A.2d 1238 (Pa. Super. 2004). In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain the guilty of crime and to deter those contemplating it. Id. However, the administrative mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth. Id.

An appellate court's standard of review in evaluating Rule 600 issues is whether the trial court abused its discretion. Com. v. McNear, 852 A.2d 401, 404 (Pa. Super. 2004). The proper scope of review in determining the propriety of the trial court's ruling is limited to the evidence on the record of the Rule 600 evidentiary hearing and the findings of the lower court. Id. In reviewing the determination of the hearing court, an appellate court must view the facts in the light most favorable to the prevailing party. Id. Due diligence is a fact-specific concept that is determined on a case-by-case basis. Id. Due diligence does not

require perfect vigilance and punctilious care, but rather a showing by the Commonwealth that a reasonable effort has been put forth. Id.

While a mere assertion by the Commonwealth that a witness is unavailable does not establish due diligence, the unavailability of a witness is a relevant factor in determining whether a continuance should be granted. Com. v. Ehredt, 401 A.2d 358, 360-361 (Pa. 1979). Mere assertions of due diligence and unproven facts do not establish cause for an extension. Com. v. Tyler, 555 A.2d 232, 234-235 (Pa. Super. 1989). Rather, the Commonwealth makes a reasonable effort to locate a witness and insure his presence at trial when the Commonwealth demonstrates that it has used several methods to locate a witness and subpoena him for trial. See Tyler, supra.

In this case, Detective Perry put forth reasonable efforts to locate the essential witnesses. He visited the last known addresses of the witnesses on multiple occasions. He checked the addresses against driver licensing information. He spoke to neighbors about the witnesses' whereabouts. He also checked public records. While Detective Perry perhaps could have done more, this court found that his efforts were reasonable, and this court's findings of fact should not be disturbed on appeal.

*H. Allegations that the Verdict Was Against the Weight of the Evidence and Insufficient to Sustain a Conviction.*

The Defendants' final allegations of error are that there was insufficient evidence to sustain the verdict and that the verdict was against the weight of the evidence.

The standard of review regarding claims of insufficiency of the evidence is well-settled. In reviewing the sufficiency of the evidence, the appellate court must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient to prove every element of the offense beyond a reasonable doubt. Com. v. Jones, 954 A.2d 1194 (Pa. Super. 2008). An appellate court may not re-weigh the evidence and substitute its judgment for that of the fact-finder. Id. The weight of the evidence is exclusively for the finder of fact, who is free to believe all, part or none of the evidence and to determine the credibility of the witnesses. When evidence conflicts, it is the sole province of the fact finder to determine credibility and to believe all, part or none of the evidence. Com. v. Lyons, 833 A.2d 245, 258 (Pa. Super. 2003). An appellate court may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Com. v. Hunzer, 868 A.2d 498, 506 (Pa. Super. 2005). Any question of doubt is for the fact-finder unless the evidence is so weak

and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. Com. v. Perez, 931 A.2d 703 (Pa. Super. 2007).

There is no requirement that the Commonwealth prove a homicide charge by direct evidence; indeed, in many instances, no witnesses are available to describe the incident which resulted in the death of the victim. Rather the Commonwealth may prove the homicide by circumstantial evidence. Com. v. Smith, 568 A.2d 600, 602 (Pa. 1989).

Here, the jury found the Defendants guilty of all charges after hearing both direct and circumstantial evidence of the Defendants' involvement in the brutal murder of Todd Mattox. Although the Defendants attempt to argue that there was no direct evidence implicating them in Mr. Mattox's murder, the jury clearly found the testimony of Saday Robinson to be compelling. She was an eyewitness to the events of May 16, 2011, and she was able to describe what she saw and heard to the jury in great detail. (T.R. 8/20/12, 525-644). Even though defense counsel engaged in a lengthy cross-examination of Ms. Robinson in an attempt to discredit her and sully her credibility, the jury chose to believe her version of what happened that day, which is within their province. (T.R. 8/20/12, pp. 561-637, 641-647). As this court stated earlier, Ms. Robinson was a compelling witness. It certainly does not shock this court's conscience or sense of justice that the jurors found her credible. In fact, this court found her to be credible and truthful

48

as well. Her testimony, alone, when believed, is sufficient evidence to uphold this verdict. It should also be noted that there were witnesses present who corroborated Ms. Robinson's testimony, thereby lending it even more credibility. *See* Trial Court Opinion, II. Factual Background, p. 5.

In addition to the testimony of Ms. Robinson, the jury heard testimony regarding the eyewitness identification of Richard Carpenter. (T.R. 8/20/12, pp. 365-366). The jurors also listened to the testimony of Mr. Thomas Brown, another fearful witness (T.R. 8/20/12, pp. 673-676), who heard Defendant Crumbley essentially admitting to the murder of Todd Mattox (T.R. 8/20/12, pp. 698-699), and who identified Defendant Ebo as "Mat-Mat." (T.R. 8/20/12, p. 748). They heard the testimony of Anthony Snyder, who identified "Mat-Mat" as Defendant Ebo (T.R. 8/20/12, p. 657), and who had previously told detectives that the victim had told him that he was going to see Mat-Mat just prior to the shooting. (T.R. 8/20/12, pp. 657-661). The jurors heard Ms. Robinson relate that she had been told by "Ace" that Mat-Mat was involved in the shootings. (T.R. 8/20/12, pp. 601-603). The jurors also had evidence of the presence of the murder weapon at the scene of a shooting involving Defendant Crumbley two (2) weeks later. (T.R. 8/20/12, 885, 927-928, 1011, 1017).

While it is true that no forensic evidence linked the Defendants to this murder, that fact does not mean that the evidence presented at trial was

the scene of a shooting involving Defendant Crumbley two (2) weeks later. (T.R. 8/20/12, 885, 927-928, 1011, 1017).

While it is true that no forensic evidence linked the Defendants to this murder, that fact does not mean that the evidence presented at trial was insufficient to sustain the convictions here. It is often the case that forensic evidence is lacking at the scene of a crime. Here the jury had the powerful and compelling testimony of a frightened eyewitness, as well as circumstantial evidence supporting that testimony. The jury's verdict was well-supported by the evidence in the case, and it should be upheld on appeal.

## IV.    Conclusion

This court committed no errors during this trial. Its rulings should be upheld. The jury's verdict was well-supported by the evidence, and its verdict should also be upheld. The Defendants' request for a new trial should be denied, and the verdict and sentencing in this case should be affirmed.

BY THE COURT:

_____, J.
Beth A. Lazzara, Judge

_____6/25/14_____
Date